**Affirmed and Majority and Concurring Opinions filed June 9, 2022.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-21-00133-CR

**THE STATE OF TEXAS, Appellant**

**V.**

**LARRY LANIER LAUSCH, Appellee**

**On Appeal from the 122nd District Court
Galveston County, Texas
Trial Court Cause No. 15CR3088**

## OPINION

After the jury returned a guilty verdict, appellee Larry Lanier Lausch filed a motion for new trial on the basis that the trial court had accidentally attached an excerpt of an appellate opinion to the jury charge. In its sole issue, appellant the State of Texas argues that the trial court erred in granting Lausch's motion for new trial. We affirm.

# I.     BACKGROUND

In 2018, Lausch was indicted on two counts of indecency with a child, a second-degree felony. *See* Tex. Penal Code Ann. § 21.11(a)(1). Lausch pleaded not guilty to both counts. Trial began in December 2020.

## A.     TRIAL EVIDENCE

The state called three witnesses at trial: M.J., the complainant; Donald Wittwer, Lausch's cousin; and Lawrence Thompson, a psychologist. Lausch called eleven witnesses, including Detective Eliud Dael Arredondo with the Hitchcock Police Department; Stephanie Shepherd, employed by Family and Protective Services; Sue Lausch, Larry Lausch's wife;[1] Officer Anjelica Rodriguez with the Hitchcock Police Department; and witnesses from the community, Donald's family, and Lausch's family.

According to M.J., the complainant, she was about fourteen or fifteen years old when her mother, Sabrina Webber, met Donald. Sabrina and Donald—who M.J. referred to as her parents—were married in 2015.[2] Lausch is Donald's cousin, but M.J. asserted that Lausch and Donald were raised like brothers. After Sabrina and Donald were married, they moved with M.J. to a house that they rented from Lausch in Texas City, Texas. Lausch lived with his wife, Sue Lausch, and his daughter in Hitchcock, Texas—a town not far from Texas City.

M.J. testified that she was close to Lausch and that they would frequently communicate with each other through Facebook and text messages. Regarding the two counts, M.J. and Sue gave different accounts of what transpired.

---

[1] To avoid confusion, we will refer to Sue Lausch by her first name and will refer to appellee by his last name.

[2] M.J. was twenty-one years old at the time of trial.

### 1. Count One

#### a. M.J.'s Testimony

On July 4, 2015, there was a party at Lausch's residence. M.J. attended the party with her parents and one of her sisters. M.J.'s parents left the party early, and M.J. was planning on spending the night at Lausch's residence, which she had never done previously. M.J. asked Lausch where she would be sleeping for the night. Lausch was watching a movie and offered M.J. a whiskey, which she drank. According to M.J., Lausch was already drunk at this point. He asked her to watch the movie with him, and she sat down to watch the movie. M.J. testified she became uncomfortable when Lausch tried to kiss her and started touching her legs so she asked him if she could go to bed.

Lausch stood up and led M.J. down the hallway to a bedroom and opened the door for M.J. M.J. claimed that once she entered, she heard the door close and lock behind her. The room was "pitch black," and Lausch started kissing M.J. and grabbing her breasts. Lausch took off his pants, removed M.J.'s pants and underwear, and then began licking M.J.'s vagina.

Sue knocked on the door and attempted to open the door but the door was locked. She called out M.J.'s name, and Lausch stopped and told M.J. not to say anything. Lausch threatened M.J. by telling her he would come after her family if she told anyone about what he did to her.

#### b. Sue's Testimony

Sue testified that the door to the room M.J. was staying in on July 4, 2015, was made of glass and could not be locked. According to Sue, the light in the hallway was always on and would shine into the bedroom. Sue asserted that they never served alcohol at their parties and that she did not see Lausch drinking at the

party. When she checked on M.J. and Lausch, M.J. had changed chairs and Lausch and M.J. both appeared mad at each other; Sue thought they were having some kind of argument.

After July 4, Lausch and M.J. maintained contact through text messages and Facebook. The State and Lausch introduced dozens of text messages the two sent each other between July 5 and August 18.

### 2. Count Two

#### a. M.J.'s Testimony

According to M.J., in either August or September of 2015, M.J. and her family went to Lausch's residence again. M.J.'s parents left to get pizza. While M.J. was in the library, Lausch walked up behind M.J. and grabbed her breast. Lausch grabbed her arm and asked what M.J. wanted, to which M.J. responded that she wanted him "to be [her] uncle and not a weirdo, not what he was doing." Lausch let her go, said, "Okay, fine," and left the room. In September and October of 2015, M.J. and Lausch continued to communicate through text messages and Facebook until M.J. blocked Lausch from contacting her on Facebook.

The first person M.J. told about what Lausch had done to her was Melissa Valdivar, a close family friend that worked with the special victims unit of the Houston Police Department. M.J. told Valdivar "shortly after it happened," but M.J. asked Valdivar not to tell anyone. Valdivar passed away in January 2016.

In October 2015, M.J. told Sabrina that Lausch had touched her inappropriately. Because she felt uncomfortable, she did not go into more specific detail.

#### b. Sue & Donald's Testimony

Soon after, Sabrina informed Donald of M.J.'s allegations concerning the

4

second incidence. Donald and Sabrina contacted Sue and arranged to meet at a park so M.J. could talk to her about Lausch's behavior. M.J. met with Sue at a park on October 15, 2015. According to Donald, M.J. spoke with Sue. After M.J. told Sue the "gist" of what happened, Sue began to cry; it seemed difficult for her to believe. After they finished talking, M.J.'s parents took M.J. home before going to Lausch's residence to confront him about the allegations.

According to Donald, when they arrived at Lausch's residence, he was crying. Without Donald saying anything, Lausch confessed that "everything that [M.J.] had told [them] was true." Then Lausch told Donald that if they were going to contact the police, they should "let him know ahead of time so he could get a bullet and take care of it before the police got there." Donald and Sabrina agreed to meet up the following Sunday to decide what to do concerning Lausch. Sabrina and Donald ultimately decided that M.J. and Lausch needed counseling.

According to Sue, she spoke to Sabrina while Donald and M.J. walked around the park; she claims to have never spoken with M.J. alone. When she heard the allegations, she asserted that she did not believe them and told Sabrina, "You know my brother. You know he would never do anything like this."

Sue arrived at her home before Donald and Sabrina; she told Lausch that at the park Donald and Sabrina told her that he had hurt M.J.'s feelings at the 4th of July party. When Sabrina and Donald arrived, Lausch said that he was sorry and that he did not mean to hurt M.J.'s feelings. According to Sue, Sabrina and Donald never mentioned the allegations, likely because they assumed Sue had mentioned them to Lausch. Instead, Sabrina discussed the need for counseling and wanted Lausch to pay for it.

On October 18, Donald received the following text message from Lausch:

Donald, I think our families need more time to heal before we get together again. Sue doesn't want to ever discuss or talk about what happened ever again. She just wants to move forward with the healing process. We are family and we love you guys, and just like in the past, we will be there for each other. As in the past I've always kept my promise. I'm considering counseling and have given up drinking all together. I'm still having trouble learning to forgive myself. We hope that you and Sabrina will understand and that we can get together soon. We just need a little more time to heal right now. We love you both and hope you have a blessed day.

According to Donald, Lausch's need for forgiveness was related to what he did to M.J. because there was nothing else for which Lausch needed forgiveness. Sue claims that she and Lausch had helped Donald and Sabrina out financially in the past, but they had grown tired of loaning them money. According to Sue, Lausch did nothing wrong that needed forgiveness; rather, he simply felt bad after cutting them off financially and deciding not to help them any further. Sue further claimed that Lausch's need for counseling was for anger issues, not for anything he did to M.J.

Donald responded to Lausch's text by telling him, "Your option is this. You will go to counseling and you will pay for [M.J.] to go. Thats [sic] the only option besides police you will be given. You both need it." According to Sue, Lausch was confused by Donald's messages to him and did not understand why Donald had sent those messages. Donald and Lausch spoke on the phone to discuss counseling, but the two never spoke again after this call.

On October 20, Donald and Sabrina reported the allegations against Lausch to the Hitchcock Police Department ("HPD").

### c. Rodriguez & Arredondo's Testimony

Officer Rodriguez testified that she had her body camera on when Donald and Sabrina came to report the allegations against Lausch. Rodriguez testified that

M.J. was crying, uncomfortable, and upset. Rodriguez testified that video footage from her body camera was not available, although footage from her camera had been downloaded to a computer. Rodriguez stated she was unaware of where the recordings were located or who was in charge of keeping the body camera recordings. Rodriguez referred the case to Detective Arredondo, who notified Children's Protective Services. When M.J. was interviewed at the Child Advocacy Center, she mentioned that Lausch touched her breast on two separate occasions, but she did not mention alcohol because she was underage.

The HPD= took videotaped statements from M.J.'s mother and stepfather regarding the alleged incidents and also took possession of M.J.'s two cell phones. The videotapes were interviews of M.J.'s mother and stepfather regarding the disputed facts of what had occurred; however, according to Arredondo, the interviews were accidentally deleted by an HPD technician. Arredondo prepared a supplemental report concerning the details of those interviews. Arredondo claimed that Donald and Sabrina's statements during the interviews were consistent with what M.J. told the forensic interviewer. The destruction of the videotapes was only mentioned at trial during Arredondo's testimony.

## B.    SPOLIATION INSTRUCTION

Prior to trial, the State filed a Notice of Possible Exculpatory Evidence to notify Lausch that the interviews had been accidentally destroyed.

Toward the end of the guilt/innocence stage, Lausch's attorney requested a spoliation instruction because M.J.'s two cell phones had been destroyed.[3] However, shortly thereafter, Lausch's attorney withdrew his request for a spoliation instruction based on the cell phones and instead urged his request for a

---

[3] Lausch presented no evidence at trial as to how the cell phones were actually lost or destroyed.

spoliation instruction based on the destruction of the videotaped statements of the interviews.

The State opposed the instruction, arguing that Lausch had not established the requisite intent to warrant a spoliation instruction. The trial court informed the parties that it had conducted research and found a decision from this Court. *See Green v. State*, 607 S.W.3d 147, 149 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Based on our decision in *Green*, the trial court observed that "[w]hen conduct can, at worse, be described as negligent, the failure to preserve evidence does not rise to the level of a due process violation absent extraordinary circumstances." *See id.* at 156. Accordingly, the trial court denied the spoliation instruction.

The trial court was given the prepared jury charges in an unstapled form, and the trial court read the jury charge for counts one and two to the jury. Both sides presented their closing arguments, with neither side mentioning the destruction of the videotaped statements. When the trial judge "scooped up" the charge for count two to hand to the court reporter, he inadvertently picked up two pages from an excerpt of *Green*.[4] The court reporter stapled the charge and the case excerpt together.

## C.    THE VERDICT

The jury found Lausch guilty on both counts of indecency with a child. *See* Tex. Penal Code Ann. § 21.11(a)(1). The trial judge noticed the case excerpt was stapled to the back of the charge when the jury returned with its verdict. Each juror was individually polled, and each juror confirmed that the verdict of "guilty" on both counts was his or her verdict. Lausch moved for a mistrial.

## D.    LAUSCH'S MOTION FOR MISTRIAL

---

[4] The excerpt from *Green* that was included in the jury charge is attached verbatim to this opinion as Appendix A.

8

The next day, before proceeding to the punishment phase, the trial court heard Lausch's motion for mistrial. The State argued that the mistrial should not be granted because mistrial is an extreme remedy, the jury did not receive any new evidence, and Lausch was not harmed because the case excerpt the jury received regarding a spoliation instruction was only an accurate reflection of the law. Lausch argued that the issue of missing statements had come up several times throughout the course of the trial: during Lausch's opening statement, the State's opening statement, the testimony of two witnesses that Lausch called at trial who testified concerning missing statements, and in Lausch's closing statement. The trial judge stated that he would go forward with the punishment phase of the trial, but that he would keep the motion for mistrial under advisement. The jury assessed punishment on both counts at four years' imprisonment and a $10,000 fine. After punishment was pronounced, the trial judge questioned the jurors regarding the impact of the attached excerpt from the *Green* opinion.

### *Testimony by the Jurors Post Verdict*[5]

#### 1. Juror 1

Juror 1 was the foreperson and testified that he read the excerpt, but "skipped to the second page pretty much." Juror 1 testified that the excerpt was passed around for everyone to read, but it was not read aloud.He further testified the excerpt had no influence on his verdict.

#### 2. Juror 2

Juror 2 admitted that she did not read or look at the excerpt. She claims the jury charges were not passed around to be read; they were instead placed on an overhead projector to be read.

---

[5] We will refer to the jurors using pseudonyms.

9

### 3.    Juror 3

Juror 3 stated that he glanced at the excerpt, but he did not "read deeply into it." He did not mention whether the excerpt affected his opinion.

### 4.    Juror 4

Juror 4 claimed that both charges were put up on an overhead projector and read aloud. Juror 4 believed that everything in the stapled packet, including the excerpt, was read aloud; however, he admitted that he did not read the excerpt. When asked if the excerpt affected his decision, he responded, "I had my ideas. So, everything that was read aloud and everything didn't really change my perspective on things."

### 5.    Juror 5

Juror 5 did not recall the excerpt being put on the overhead projector. She also admitted to not reading the excerpt: "I wasn't made aware that we were supposed to read that."

### 6.    Juror 6

Juror 6 did not read through the excerpt, but he did recall reading through every page of the jury charge. He admitted that not every page of the charge was placed on the projector.

### 7.    Juror 7

Juror 7 stated that the jurors did not pass around the jury charge; instead, they all read through the jury charge as it was placed on the overhead projector. However, according to her, the excerpt was not placed on the overhead projector.

### 8.    Juror 8

Concerning the excerpt, Juror 8 stated, "I do not believe they were put on the

overhead [projector]. I believe they were read out loud." The following conversation took place between the State and Juror 8:

> [State]: Sir, the last two pages there that the Judge was asking you about that were attached to the charge for Count 2, did that impact your deliberation in any way?
>
> . . .
>
> [Juror 8]: Me personally, or as a group?
>
> [State]: You individually, sir.
>
> [Juror 8]: Me personally, yes.

When further questioned about whether the excerpt weighed in favor of one of the two parties, Juror 8 stated that he did not understand the question; he was released without additional questioning.

### 9. Juror 9

Juror 9 did not recall looking at or reading the excerpt; she also claimed that it was never read aloud during jury deliberation.

### 10. Juror 10

Juror 10 testified that the charges were placed on the overhead projector. He "read through most of it, the charges that pertained." However, when questioned specifically about the excerpt, he stated that it was not read aloud or placed on the projector. He did not recall seeing or reading the excerpt.

### 11. Juror 11

Juror 11 believed the jurors passed the charge around to read. But he did not think the excerpt was ever placed on the projector or read aloud, although he knows that he personally did not read it because he was not made aware it was

something that needed to be read.

### 12.    Juror 12

Juror 12 testified that all of the jurors had an opportunity to see the charges, flip through them, and see them; even though he did not recall seeing the excerpt and admitted that he did not read it, he claims the excerpt was passed around.

### 13.    Trial Court's Ruling

After all of the jurors testified, Lausch re-urged his motion for mistrial. Lausch argued that the loss or destruction of evidence was a fairly substantive part of his defensive theory. In addition, jurors 3 and 8 admitted to reading the excerpt and one juror—juror 8—claimed that the excerpt affected his verdict. Thus, Lausch argued that the excerpt constituted a judicial comment on the weight of the evidence, bolstered the State's case, and increased the defense's burden of proof regarding lost evidence.

The State averred that juror 8 only testified that the excerpt affected his "deliberations," not his actual verdict, and additionally, that the record does not reflect how the excerpt actually affected juror 8's deliberations. The trial court announced to the parties that it was going to take the issue under advisement; on December 22, 2020, Lausch's motion for mistrial was denied.

### E.    LAUSCH'S MOTION FOR NEW TRIAL

Lausch subsequently filed a motion for new trial which was heard by the court. No new evidence was presented at the hearing on the motion; only arguments were heard. Lausch again argued that the loss of evidence was a crucial component of his defense. However, Lausch also conceded that the trial court's decision to deny his request for a spoliation charge "was probably the right thing to do if there was no evidence of malicious intent or bad faith on the part of the

Hitchcock Police Department in losing that evidence." Lausch also admitted that the jurors receiving the case excerpt did not constitute the receipt of "other evidence" by the jurors during deliberation. Nevertheless, Lausch still argued that he was harmed because even if the jurors gave conflicting accounts of what happened during deliberation, at least one juror—juror 8—testified that the excerpt affected his deliberation. Under the Texas Rules of Appellate Procedure 21.3(b), Lausch argued, a defendant must be granted a new trial "when the trial court has misdirected the jury about the law or has committed some other material error likely to injure the defendant's rights." *See* Tex. R. App. P. 21.3(b). The trial court granted Lausch's motion for new trial. This appeal followed.

## II. ANALYSIS

The State argues that the trial court erred in granting Lausch's motion for new trial because attaching the case excerpt does not constitute error, and even if it was error, the record does not show that Lausch suffered any harm. Lausch avers on appeal that the destruction of the videotapes was crucial to his defense because it demonstrated the "terrible police work" in the case; accordingly, Lausch argues that he suffered some harm.

## A. STANDARD OF REVIEW & APPLICABLE LAW

We review a trial court's ruling on a motion for new trial for an abuse of discretion. *See Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App. 2021). The Texas Courts of Criminal Appeals has clarified our standard of review:

> apply a uniformly deferential standard of review to a trial court's findings in ruling on a motion for new trial: the trial court is the exclusive judge of the credibility of the evidence, regardless of whether the evidence is controverted, and its ruling will be reversed only for an abuse of discretion, that is, if it is arbitrary or unsupported by any reasonable view of the evidence.

*Id.* However, when a defendant raises a claim under Rule 21.3(b) of the Texas Rules of Appellate Procedure, as Lausch did in this case, error is reviewed under the *Almanza* framework. *See Igo v. State*, 210 S.W.3d 645, 646 (Tex. Crim. App. 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). "An appellate court owes no deference to a trial court's determinations when they are actually determinations as to questions of law or mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor." *State v. Ambrose*, 487 S.W.3d 587, 597 (Tex. Crim. App. 2016). In *Ambrose*, the Texas Supreme Court concluded that, the trial court's determination under the *Almanza* framework that the defendant suffered egregious harm from a jury charge error was a legal conclusion to which no deference was required by the appellate court. *See id.*

"[I]n each felony case . . . tried in a court of record, the judge shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case. . . ." Tex. Code Crim. Proc. Ann. art. 36.14; *see also* Tex. R. App. P. 21.3(b). In analyzing a jury charge issue, we first determine whether error exists. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Almanza*, 686 S.W.2d at 171 . "Only if we find error do we then consider whether an objection to the charge was made and analyze for harm." *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). If the alleged jury charge error was properly preserved, then reversal is required if it is shown that the error caused some harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Neither the State nor the defendant has a burden to prove harm. *See id.* However, the reviewing court must find that the defendant "suffered some actual, rather than merely theoretical, harm from the error." *Id.* (quoting *Warner v. State,* 245 S.W.3d 458, 462 (Tex. Crim. App. 2008)).

"Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Ambrose*, 487 S.W.3d at 597 (quoting *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)). Under the relevant standard, we have traditionally considered (1) the entirety of the jury charge, (2) the state of the evidence, (3) counsel's arguments, and (4) any other relevant information revealed by the entire trial record. *Id.* Courts are required to review the relevant portions of the entire record to determine whether a defendant suffered actual harm, as opposed to theoretical harm, as a result of the error. *Id.*

**B.    APPLICATION**

**1.    Attaching the Case Excerpt Constituted Error**

We start by determining whether error exists. *See Ngo*, 175 S.W.3d at 743. Although factually not identical, we find *Watts v. State*, 99 S.W.3d 604, 611 (Tex. Crim. App. 2003) instructive.

In *Watts*, immediately prior to jury deliberations, the trial court orally summarized the interpretation of the relevant Water Code statute as stated by the Texas Court of Criminal Appeals in *Am. Plant Food Corp. v. State*, 587 S.W.2d 679, 683 (Tex. Crim. App. 1979). Although the Court of Criminal Appeals concluded the trial court's summary of *Am. Plant Food Corp.* was "fairly accurate, if somewhat simplified," the court ultimately concluded that the trial court committed error by giving the oral instruction to the jury because it constituted a judicial comment on the weight of the evidence. *See Watts*, 99 S.W.3d at 611.

The Court of Criminal Appeals concluded that it is appropriate for trial courts to take judicial notice of the existence, content, and applicability of other cases, but affirmed that judicial notice is "*always* taken outside the presence of the

jury," *id.*, while further expressing that the jury

> determines questions of fact in light of the law as it is finally determined and given to it by the court in the written jury charge. All of the applicable law is contained within that written jury charge. The jury charge does not contain excerpts from judicial decisions or any statements that an appellate court has held that proof of "X" fact fulfills "Y" legal requirement.

*Id.*

In the present case, while the trial court did not directly address the jury concerning a prior case, the jury charge contained exactly what the Court of Criminal Appeals in *Watts* determined should not be included in a jury charge: an excerpt from a judicial opinion indicating that "proof of "X" fact fulfills "Y" legal requirement—in this case, an excerpt wherein an appellate court has held that the negligent loss of evidence fails to rise to the level of a due process violation. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (stating that the trial court should prepare a jury charge "setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence"). Thus, we conclude that the inclusion of the excerpt was error. *See id.*; *see also* Tex. R. App. P. 21.3(b); *Watts*, 99 S.W.3d at 611.

### 2. Lausch Suffered Some Harm

The State concedes that if we determine error existed, then the proper harm analysis is whether Lausch suffered "some harm" because Lausch timely objected. *See Reeves*, 420 S.W.3d at 816. In assessing whether "some harm" occurred, we consider the error in light of: (1) the entire jury charge, (2) the state of the evidence, (3) the jury arguments, and (4) any other relevant information as revealed by the record as a whole. *French v. State*, 563 S.W.3d 228, 235–36 (Tex. Crim. App. 2018). "If we conclude the error was calculated to injure the

defendant's rights, we must reverse." *Smith v. State*, 612 S.W.3d 711, 719 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

### a.    The Entire Jury Charge

As to this factor, we consider the entire jury charge to determine if "anything in the balance of the jury charge either exacerbated or ameliorated" the complained of error. *See French*, 563 S.W.3d at 236 (holding that the court of appeals erred by simply reiterating the trial court's error without analyzing the rest of the jury charge).

Other than the excerpt itself, Lausch does not assert that any other aspect of the jury charge was erroneous. Nevertheless, we note that the excerpt from the *Green* case at least partially undercuts Lausch's defensive theory that the police investigation was poorly conducted and that he was negatively impacted as a result. Thus, we conclude that this factor weighs in favor of finding harm. *See id.*

### b.    The State of the Evidence

The destruction of evidence and Lausch's defensive theory was raised at trial through Rodriguez and Arredondo. Arredondo admitted that he "dropped the ball" in failing to interview various individuals during his investigation, including Melissa Valdivar, the first person to whom M.J. disclosed the alleged sexual abuse.

Ultimately, this case rests on whether the jury believed M.J.'s allegations against Lausch. The conflicting testimony of M.J. and Lausch, as well as the conflicting testimony of Sue, Sabrina, and Donald, made the credibility of the witness testimony in this case crucial to the jury's verdict.

The jury was presented with text messages to show M.J. and Lausch's "unusual relationship" and that Lausch felt guilty about something he did. Accordingly, the State argues that the jury simply needed to make credibility

17

determinations to weigh M.J.'s allegations against the testimony of Lausch's wife; the jury did not need the videotaped statements made by M.J.'s mother and stepfather. The jury heard M.J.'s testimony concerning the alleged offense. In light of all of the evidence presented at trial, we conclude this factor weighs in favor of finding no harm.

### c.   The Jury Arguments

During his opening statement, Lausch's attorney very briefly mentioned that the jury would hear from Arredondo about "everything that did not happen." The State did not mention the loss of evidence in its opening.

In the State's final argument, the State focused on M.J.'s testimony and the text messages she and Lausch sent to each other. In its closing argument on rebuttal, the State again focused on the messages Lausch sent to M.J. The State mentioned that Arredondo did a "horrible job" and that Rodriguez "could have done better," but the State did not specifically refer to the loss or destruction of evidence.

In Lausch's closing argument, trial counsel emphasized the character witnesses called by Lausch. He briefly mentioned how Lausch did not have access to M.J.'s cell phones or to Rodriguez's body camera footage, but he never discussed the accidental deletion of Arredondo's interviews with M.J.'s mother and stepfather.

In the closing argument by Lausch's co-counsel, he focused on the State's burden of proof. He was heavily critical of the police work in this case and argued that the case was very poorly handled, but he also did not mention the deleted videotaped interviews.

Finally, we note that Lausch does not argue that the State incorrectly stated

the law during closing argument. We conclude this factor weighs slightly in favor of finding no harm. *See Gelinas v. State*, 398 S.W.3d 703, 709 (Tex. Crim. App. 2013) (concluding that the third factor of the *Almanza* analysis weighed in favor of finding no harm because even though the State's closing argument contained a few misstatements of law, the State ultimately set out the correct law to the jury in its closing argument).

### d.    Other Relevant Information

In considering this final factor, we review any other relevant information as revealed by the record as a whole. *See French*, 563 S.W.3d at 235–36. We first note that we have not found, nor has Lausch pointed us to, any part of the voir dire that is relevant to our harm analysis. *See Ngo*, 175 S.W.3d at 75. In reviewing the remainder of the record as a whole, the most important information is the jurors' post-verdict testimony. It is true that the jurors' testimony is somewhat inconsistent regarding what may or may not have occurred during jury deliberations; two jurors testified that the charge with the excerpt was read aloud, others claimed the charge was displayed on an overhead projector, some claimed that both occurred while others disclaimed both. However, despite the contradictions, Juror 8 specifically testified that the excerpt affected his deliberations.

The State argues on appeal, as it did at the hearing on Lausch's motion for new trial, that there is no harm because Juror 8 only testified that the case excerpt affected his deliberations, not his verdict. However, we are not persuaded by this distinction, especially given the context of Juror 8's testimony. Juror 8 did not personally use the word "deliberations" or "verdict." Rather, it was the State that asked Juror 8 if the excerpt "impact[ed] [his] deliberations in any way." Juror 8 simply responded in the affirmative, without any testimony as to the nature or extent of the impact on his deliberations.

The State also argues that there is no evidence of actual harm because there was no way for the jurors to apply the case excerpt in reaching the verdict; thus, the State argues that Juror 8, and the other jurors, ultimately still had to find all of the elements of the offenses beyond a reasonable doubt. While we acknowledge that Juror 8's testimony is vague and fails to explain how the case excerpt affected his deliberations, he affirmatively testified that the excerpt did affect his deliberations. We conclude that this evidence is sufficient to satisfy the relatively lower standard of "some harm." *See Reeves*, 420 S.W.3d at 816 (finding some harm when the trial court erroneously instructed the jury on the law of provocation, which undermined defendant's sole defense); *Watts v. State*, 140 S.W.3d 860, 868 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("While it is unseemly to predicate reversible error upon an accurate statement of the law, the Court of Criminal Appeals clearly suggests by its opinion that an appellant may be harmed by such an instruction.").

Ultimately, because the attached excerpt impacted Lausch's defensive theory, we cannot say that the error did not cause harm. Therefore, we conclude this factor weighs in favor of finding "some harm." *See Reeves*, 420 S.W.3d at 816.

### 3.    Summary

We conclude that the trial court committed error by attaching the case excerpt to the jury charge. Considering the entire jury charge, the state of the evidence, the jury arguments, and other relevant information, such as the juror testimony adduced after sentencing, we conclude Lausch suffered some actual, non-hypothetical harm. We overrule the State's sole issue.

### III.    CONCLUSION

We affirm the trial court's order.

                              /s/     Margaret "Meg" Poissant
                                      Justice


Panel consists of Justices Jewell, Bourliot, and Poissant (Jewell, J., concurring).
Publish — Tex. R. App. P. 47.2(b).

Court of Appeals of Texas, Houston (14th Dist.).

Jonathan GREEN. Appellant

v.

The STATE of Texas, Appellee

NO. 14-19-00083-CR

Opinion filed September 1, 2020

## II. The Trial Court Did Not Err by Denying Appellant's Request for a Spoliation Instruction.

Hall gave two written statements to the police: the first on December 15, 2017 (to Officer White) and the second on December 18, 2017 (to Detective Cantu). According to Hall, in his first statement he said he "didn't know nothing about [Appellant's] phone or all that kind of stuff." Hall testified that this first statement was a lie. Hall relied on his second statement to refresh his recollection at Appellant's trial and testified regarding Appellant's (1) actions on December 14, 2017 and (2) lost phone. Hall's first statement to Officer White could not be located at the time of trial. Officer White testified that, "[t]o the best of [his] knowledge." (1) Hall completed and signed the statement and (2) he (Officer White) turned it over to Detective Cantu. Officer White said he had looked for this *156 first statement but had "no idea" what happened to it. Detective Cantu also was asked about Hall's first statement and said she did not "have any idea where that statement is."

At the jury charge conference, Appellant's counsel requested a spoliation instruction with respect to Hall's first statement. The trial court denied the request. Challenging this determination on appeal, Appellant argues that Hall "exonerated Appellant in his first statement and then changed his story to implicate Appellant for the sexual assault in his second interview after he realized that the police considered [Hall] a possible suspect to the crime."

A review of alleged jury charge error involves a two-step process examining: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W .3d 738, 743-44 (Tex. Crim. App. 2005) (en banc); Jones v. State. 531 S.W .3d 309. 321 (Tex. App.—Houston [14th Dist.] 2017. pet. ref'd). We analyze these issues below.

## A. Error

Spoliation refers to the loss or destruction of evidence. *Guzman v. State*, 539 S.W.3d 394, 401 (Tex. App.—Houston [1st Dist.] 2017, pet. refd). Absent a showing of bad faith, we cannot find a due process violation that warrants a spoliation instruction. See *Arizona v. Youngblood*, 488 U.S. 51 , 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); see also *Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010): *Guzman*, 539 S.W.3d at 401; and *Moody v. State*, 551 S.W.3d 167, 172 (Tex. App.—Fort Worth 2017, no pet.).

Bad faith requires "more than simply being aware that one's actions or inaction could result in the loss of something that is recognized to be evidence." *Napper*, 322 S.W.3d at 238. Rather, bad faith requires a showing of "some sort of improper motive, such as personal animus against the defendant or a desire to prevent the defendant from obtaining evidence that might be useful." *Id.* When conduct can, at worst, be described as negligent, the failure to preserve evidence does not rise to the level of a due process violation absent extraordinary circumstances not present here. *See generally Arizona*, 488 U.S. at 58, 109 S.Ct. 333 and *Burdick v. State*, 474 S.W.3d 17, 27 (Tex. App.—Houston [14th Dist.] 2015. no pet.) ("A showing of negligence does not qualify as bad faith.").

Here, there is no evidence of bad faith and Appellant's attempt to frame the loss of evidence as "gross indifference" is unsupported under Texas case law. Instead, the record reveals Officer White testified that, "[t]o the best of [his] knowledge," he turned Hall's first written statement over to Detective Cantu. Detective White testified that prior to Appellant's trial, he looked for the statement but could not find it. According to Detective White, *157 the last time he saw the statement was on the day he took it. Both Officer White and Detective Cantu testified that they did not know what happened to the first statement. Under these facts, we have insufficient facts to conclude either satisfied the onerous standards of "bad faith".

Having concluded the trial court did not err when it denied Appellant's request for a spoliation instruction, we need not reach the question of whether it was harmful. *See, e.g., Guzman*, 539 S.W.3d at 400-02.

We overrule Appellant's second issue.

**Conclusion**

We affirm the trial court's final judgment.